UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SPENCER MARTIN, | |
| Plaintiff, | No. 17 C 04328 |
| v. | Judge Thomas M. Durkin |
| GHALIA OBAISI, as the Independent Executor of the Estate of SALEH OBAISI, M.D. (deceased), | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Spencer Martin sued Dr. Saleh Obaisi,[1] the former medical director of Stateville Correctional Center, under 42 U.S.C. § 1983, alleging a violation of his 8th Amendment rights. Martin's claim stems from medical care he received while incarcerated at Stateville Correctional Center. Before the Court is Obaisi's motion for summary judgment. For the reasons stated below, Obaisi's motion is granted.

**Background**

The following facts are undisputed except where otherwise indicated. On November 10, 2013, Martin slipped while climbing into his bunk at Stateville Correctional Center ("Stateville") and injured his shoulder. Pltf.'s Resp. to Def.'s L.R. 56.1 Statement of Material Facts ("PR") ¶ 26 (R. 108). Martin reported the fall to a

---

[1] Dr. Obaisi passed away several months after this case was filed. The Court thereafter substituted Ghalia Obaisi, the Independent Executor of Dr. Obaisi's estate, as the Defendant. R. 29. For simplicity, the Court will still refer to the Defendant as "Obaisi."

1

nurse at Stateville a few days later. PR ¶ 27. He also reported a history of prior dislocations in the same shoulder. PR ¶¶ 27, 28. The nurse prescribed ibuprofen. PR ¶ 27.

On December 11, 2013, Martin was seen by PA LaTanya Williams. Def.'s Resp. to Pltf.'s L.R. 56.1 Statement of Additional Facts ("DR") ¶ 4 (R. 113). Martin complained of a throbbing pain in his shoulder. DR ¶ 4. Williams prescribed shoulder immobilization and referred Martin for an appointment with Dr. Obaisi on January 15, 2014. PR ¶ 28; DR ¶ 4. Martin then saw Dr. Ann Davis on December 30, 2013. PR ¶ 29. Martin told Davis about his history of shoulder "popping" dating back to 1996. PR ¶ 29. Davis diagnosed a chronic subluxing shoulder and prescribed physical therapy and medication. PR ¶ 29.

Martin did not see Dr. Obaisi on January 15, 2014 as had originally been scheduled. DR ¶ 9. On February 25, 2014, Martin saw a nurse in the muscle strain and joint pain clinic and was told to take ibuprofen and apply cold compresses. PR ¶ 30. On March 16, Martin saw PA Claude Owikoti for evaluation of his shoulder. PR ¶ 31. Owikoti was unable to complete the physical examination because Martin remained handcuffed throughout. PR ¶ 31. Owikoti concurred with the physical therapy referral. PR ¶ 31. Martin underwent a physical therapy evaluation on March 31. PR ¶ 32. The on-site therapist indicated that Martin may benefit from therapy. PR ¶ 32.

Martin saw another nurse on April 25 and was scheduled for an appointment with Obaisi on May 6, 2014. DR ¶ 11. Additional appointments for Martin to see

2

Obaisi were set for June 4, July 2, August 5, September 5, and October 8, but Martin did not see Obaisi on any of these dates. DR ¶ 12. Stateville was under lockdown on May 6, August 5, and October 8. DR ¶ 12. The July 2 and September 5 appointments were apparently cancelled due to "no provider available." DR ¶ 12.

Obaisi saw Martin for the first time on November 6, 2014. PR ¶ 33. Obaisi performed a physical examination and assessed recurrent right shoulder dislocation. PR ¶ 33. He prescribed a steroid injection, which he administered on November 13. PR ¶¶ 33, 34. Follow-up appointments were scheduled for January 8, 2015 and January 28, 2015. DR ¶ 14. However, Martin was not seen on either of those dates, apparently due to no provider being available. DR ¶ 14. Martin had another appointment scheduled for April 14, but that was cancelled due to a facility lockdown. DR ¶ 15.

Martin saw a nurse on May 28, 2015, complaining of shoulder pain moving into his back. DR ¶ 16. Another appointment with Obaisi was scheduled for June 22, but that appointment was rescheduled due to a facility lockdown. DR ¶ 17. Additional appointments on July 7 and July 22 were rescheduled due to "no provider available." DR ¶¶ 17, 18. Martin was eventually seen by Dr. Alma Martija on July 30, 2015. PR ¶ 37. She conducted a physical examination and found a limited range of motion, diagnosing a possible frozen shoulder. PR ¶ 37. Martija ordered an x-ray and another physical therapy referral. PR ¶ 37. She also prescribed Tylenol plus codeine for pain relief after PT sessions. PR ¶ 37. Martin's x-ray was scheduled for August 3, 2015, but was cancelled due to a security lockdown. PR ¶ 38.

3

On August 13, 2015, Martin saw Obaisi for the first time since his steroid injection on November 13, 2014. PR ¶ 39. Obaisi conducted a physical examination and diagnosed a possible rotator cuff disorder. PR ¶ 39. He referred Martin to Wexford Health Sources' collegial review for potential offsite referral to an orthopedic surgeon and issued another low bunk permit. PR ¶ 39. Wexford approved the offsite referral on August 15, and on December 18, Martin underwent an offsite consultation with a UIC orthopedic surgeon, Dr. Ben Goldberg. PR ¶¶ 40, 43. Goldberg recommended an MRI, and Obaisi secured approval for this test on December 22. PR ¶¶ 43, 44. Martin underwent the MRI on January 19, 2016. PR ¶ 45. He returned to UIC for a consultation with Goldberg on February 8, 2016 and decided on surgical treatment. PR ¶ 47.

Martin saw Obaisi in clinic again on February 9, 2016, and on February 16, Obaisi secured approval for Martin's orthopedic surgery. PR ¶ 48. Martin saw Obaisi again on March 16 while his surgery was pending and presented with no changes. PR ¶ 49. Martin underwent surgery on May 2, 2016, consisting of an open Bankart repair and removal of a calcified density. PR ¶ 50. Obaisi saw Martin the following day and discharged him back to his cell on Martin's request. PR ¶ 51. He also prescribed Tylenol plus codeine and ordered a low bunk permit. PR ¶ 51.

Obaisi saw Martin several more times in the months following his surgery. PR ¶¶ 53-67. During that time, Obaisi prescribed medication and physical therapy and referred Martin back to UIC for surgical follow-up. PR ¶¶ 53, 54. Following another off-site consult, Obaisi sought approval from Wexford collegial review for an

4

additional MRI, which was completed on February 3, 2017. PR ¶¶ 61-63. At a March 10, 2017 consult, Goldberg assessed some residual pain and stiffness and discussed an eventual need for total shoulder replacement with Martin but noted that he was too young for such a procedure at that time. PR ¶ 65. He recommended Martin continue to undergo physical therapy at Stateville. PR ¶ 65. Obaisi saw Martin again in clinic on March 28 and noted the recommendation for continued physical therapy but no other follow-up. PR ¶ 67. Martin was transferred from Stateville Correctional Center to Menard Correctional Center in June of 2017. PR ¶ 68.

Both parties produced evidence from medical experts, The details of those opinions are not critical to resolution of the instant motion, so they are summarized here. Obaisi's correctional medicine expert, Dr. Tubbs, opined that Martin's treatment was reasonable and adequate, and reflected a conservative treatment plan that was elevated by Obaisi in November of 2014. Dr. Tubbs also opined that in his experience working in correctional medicine, it is typical that nursing staff or medical assistants handle scheduling and rescheduling of appointments. Obaisi's orthopedic surgery expert, Dr. Prodromos, opined that the surgery recommended by Dr. Goldberg was not necessary and the treatment Obaisi had been providing at the time was appropriate. Martin disclosed a medical expert, Dr. Miller, who opined that Obaisi, as medical director, was responsible for providing timely care to Martin, and that the delays in Martin's treatment caused by cancelled appointments exacerbated his condition.

5

Obaisi passed away before he could be deposed in this case. PA Williams testified that a separate staff from the medical clinicians handles scheduling. PR ¶ 15. Dr. Davis testified that during her employment at Stateville (through April 2014), Obaisi sometimes was unable to keep his appointments due to other duties as medical director, including responding to medical emergencies, administrative tasks, or legal obligations. PR ¶ 16. In the event a patient was not able to see a particular clinician for an urgent matter, other care providers were available on site, though they were not always doctors. PR ¶ 17. Prison security officials have final say on when inmates are permitted to see medical providers on a "medical special needs permit." PR ¶ 19. It is undisputed that Obaisi had no control over prison lockdowns. PR ¶ 20.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 2021 WL 4486445, at *1 (7th Cir. Oct.

6

1, 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Analysis

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display 'deliberate indifference to serious medical needs of prisoners.'" *Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A deliberate indifference claim has two components, one objective and one subjective. *Id.* at 653. "To satisfy the objective component, a prisoner must demonstrate that his medical condition is 'objective, sufficiently serious.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The subjective component requires proof that the defendant knew of and disregarded an "excessive risk to inmate health." *Id.*

### I. Serious medical need

Obaisi disputes that Martin's medical condition ever rose to the level where the Eighth Amendment was implicated. Citing to evidence from Martin's various examinations, Obaisi claims that Martin merely suffered from a chronic shoulder condition that, while it may have caused some pain, was not an emergent or urgent concern.

Obaisi is correct that "[not] every ache and pain or medically recognized condition involving some discomfort can support an Eighth Amendment claim." *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (7th Cir. 1997). However, Supreme Court precedent also makes clear that the "serious medical need" standard encompasses

7

"medical conditions far less critical than 'life-threatening.'" *Id.* at 1370 (citing *Estelle v. Gamble*, 429 U.S. 97, 107 (1976) (assessing Eighth Amendment claim premised on treatment of a back strain with rest, muscle relaxants, and pain relievers)). Recognizing the difficulty in articulating a workable standard for "seriousness," the Seventh Circuit in *Gutierrez* surveyed several other circuits' treatment of the issue. *See id.* at 1373. For example, courts in the First Circuit consider a "serious" medical as "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Laaman v. Helgemoe*, 437 F. Supp. 269, 311 (D.N.H. 1977). Courts in the Ninth Circuit regard a medical condition as "serious" if the condition "could result in further significant injury or the "unnecessary and wanton infliction of pain," and consider factors such as whether the condition "significantly affects an individual's daily activities." *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled in part on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

Applying these standards here, the Court finds that a reasonable jury could conclude that Martin suffered from a serious medical condition. The record is replete with evidence that Martin suffered from shoulder pain stemming from his condition, and that his range of motion was occasionally affected, sometimes severely. The medical staff that examined him found it necessary to prescribe medication of varying strengths as well as physical therapy and, eventually, surgery. Given Martin's reported history of shoulder dislocation, it is also reasonable to conclude that he faced

8

a risk of further injury without treatment. Indeed, the fact the prison medical staff regularly gave him low bunk permits indicates that they saw some risk associated with the simple act of climbing into a raised bed.

Obaisi's characterization of Martin's condition as "chronic" does not diminish its seriousness. In fact, courts appear more likely to discount medical conditions that are acute and can be expected to resolve on their own without serious medical intervention. *See, e.g., Gibson v. McEvers*, 631 F.2d 95, 98 (7th Cir. 1980) (no Eighth Amendment violation for failure to treat a common cold); *Williams v. Elyea*, 163 F. Supp. 2d 992, 997 (N.D. Ill. 2001) (finding that complaints of pain associated with a quarter-inch cut on inmate's cheek were not sufficiently serious under Eighth Amendment).

The evidence also permits a reasonable jury to find that Obaisi knew about Martin's condition. His medical history was recorded by several providers before Obaisi first saw him, and it would be reasonable to infer that Obaisi considered this history as part of Martin's examination and assessment. Obaisi's own treatment plan, which included a steroid injection and outside referral, also supports a finding that he recognized Martin's condition as one that required further treatment.

## II. Sufficiency of treatment

The remaining question is whether a jury could reasonably find that Obaisi's response to Martin's medical condition constituted deliberate indifference. The deliberate indifference standard is akin to the criminal recklessness standard. *See Farmer v. Brennan*, 511 U.S. 825, 839-40 (1994). Mere negligence, as might suffice in

9

an ordinary medical malpractice claim, will not support liability under the Eighth Amendment. *See Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). Rather, a prisoner's medical treatment will violate the Eighth Amendment only if it is "blatantly inappropriate." *Greeno*, 414 F.3d at 654. This can be shown through evidence that a prisoner was "literally ignored" or that the treatment was such that "no minimally competent professional would have so responded under those circumstances." *Johnson v. Obaisi*, 2020 WL 433872, at *6 (N.D. Ill. Jan. 28, 2020) (citing *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011), and *Pyles v. Fahim*, 711 F.3d 403, 409 (7th Cir. 2014)).

Overlaid atop this standard is the requirement that a § 1983 defendant be "personally responsible" for an alleged Eighth Amendment violation. *See Rasho v. Elyea*, 856 F.3d 469, 478 (7th Cir. 2017). Section 1983 liability cannot be premised on a theory of *respondeat superior*. *Kinslow v. Pullara*, 538 F.3d 687 (7th Cir. 2008). Accordingly, Obaisi cannot be held responsible for any alleged mistreatment purely by virtue of being Stateville's medical director. He must have actively participated in the complained-of conduct, or at the very least facilitated, approved, condoned, or willingly turned a blind eye to it. *Rasho*, 856 F.3d at 478.

Martin's primary argument for finding deliberate indifference rests on the delays between his appointments with Obaisi, many of which were repeatedly rescheduled. A delay in medical treatment can support an Eighth Amendment claim, though the plaintiff must offer medical evidence that the delay, rather than the underlying condition, caused the harm. *Jackson v. Pollion*, 733 F.3d 786. He cites to

10

the opinion from his expert, Dr. Miller, who opined that the delays in action by Obaisi caused Martin to suffer persistent pain.

Martin's argument faces two major problems. First, the evidence demonstrates that the delays in Martin's appointments with Obaisi were largely the result of treatment decisions by other Stateville medical staff. In fact, he was seen relatively frequently from the time he first reported his shoulder injury in November 2013. Those providers, including other doctors, prescribed various treatments and, at times, made new appointments for Martin to see Obaisi. How—and how urgently—a patient needs to be treated is a question of medical judgment, and there is no evidence that any provider, including Obaisi, intentionally delayed the provision of care to Martin. *See, e.g.*, *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019) (holding that failure to immediately refer inmate to outside consultant was not deliberate indifference; doctor made reasonable medical judgment to delay referral until he had more information).

The opposing expert evidence does little to help Martin's cause. A difference in opinion among physicians over the proper course of treatment is insufficient to make out a constitutional claim. *See Murphy v. Wexford Health Sources Inc.*, 962 F.3d 911, 916 (7th Cir. 2020). If this was a medical malpractice case, the expert disagreement might be a good reason to deny summary judgment. But the question here is not whether Martin's treatment met the reasonable standard of care, but whether it was so deficient that no minimally competent professional would have undertaken to treat in that manner.

11

Second, even if the delays between appointments with Obaisi were a sufficient basis for Eighth Amendment liability, the evidence does not support a reasonable finding that Obaisi was personally responsible for those delays.[2] Many were caused by prison lockdowns, something Obaisi had no control over. Others were apparently due to a lack of available providers, though whether that always referred to Obaisi is unclear. Regardless, Obaisi was not the primary person responsible for scheduling prisoner medical appointments, and he had multiple other duties as medical director. If anything, prison security staff had the final say on when prisoners would be allowed to see providers for special care. And every time Obaisi was able to see Martin, he took prompt action—most of the major escalations in Martin's care came at Obaisi's direction.

In summary, even assuming the evidence is sufficient to show that Martin suffered from a serious medical need, no reasonable jury could find that Dr. Obaisi was deliberately indifferent to it. Obaisi is therefore entitled to summary judgment.[3]

---

[2] There is also a question whether the relevant time period should begin with Martin's November 10, 2013 injury or his first appointment with Obaisi on November 6, 2014. Because the Court finds the evidence insufficient to create a genuine issue of material fact with or without this period included, it offers no opinion as to this issue.

[3] Because Martin's substantive claim fails as a matter of law, the Court need not consider his arguments regarding the appropriateness of punitive damages.

## Conclusion

For the foregoing reasons, Defendant's motion for summary judgment, R. 98, is granted. Civil case terminated.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: February 22, 2022